May it please the Court, I am Robert Gooden on behalf of the Appellant David Bradlow, the Plan Dispersing Agent for the Bankruptcy Estate of Melvin M. Belli. As the Court is well aware, the central issue in this case is whether Mr. Belli is a member of the Castano Group as initially agreed to in 1994, and we say is codified in a writing of October 1996, and therefore entitled to make a claim for a share of the $1.25 billion fee which was awarded to that group for its efforts in the tobacco cases going all the way back to the very beginning in 1994. As you know from the briefs, I believe the central question, or actually a matter of contract construction, which has not been adequately addressed, let alone answered by either of the courts below or the opponents, is who is the attorney member as defined in the October 1996 as set forth on line 5 of Exhibit A. And as you know Just a few questions for me just to try to get the big picture here. Sure. Is the claim of the creditors on behalf of the estate greater than any potential recovery? I believe that's the case, Your Honor. I believe that the bankruptcy estate has claims of over $100 million in it. A lot of them are unliquidated malpractice claims, frankly. Okay. So under no scenario, do the beneficiaries, the personal beneficiaries of the estate have anything to gain here? Well, no, I think they might. I mean, depending on how those — as I understand it, the estate consists of administrative creditors, maybe a few trade creditors, and then these unliquidated malpractice claims. So assuming there were a large recovery in this case, which obviously we hope there would be, unless those liquidated — unliquidated malpractice claims are successful, I think there might be money for the probated heirs of Mr. Belli. I think that's the status. Thank you. So in a nutshell, I think — and I'll flesh this out a little bit more. I think that the question I just posed, which I don't think was adequately answered, is if you look at the structure of that 96 agreement, it's very clear that they define the members as law firms who had joined together in 1994 to prosecute the Castano case. And it goes on to recognize the value of those contributions, makes it very clear the time expended during that period is going to get credit for. And then if you look at Exhibit A itself, it consists of, you know, four columns. One column names an individual. The second column names law firms. The third column has a geographic location. And the fourth column contains costs as submitted originally. Let me ask you this. You have the 94 agreement and you have the 96 agreement. Correct. And let's assume for these purposes that there's a tribal issue as to whether the 96 agreement is a memorialization or it's a new agreement or whatever. But, all right, that being said, if you also assume for a moment that Louisiana law controls, isn't the estate's interest determined at the time of Belli's death? And if the estate interest is determined at the time of his death, what does the estate have to show that it's entitled to, to a share of fees in a case that has not yet been filed? Well, I think the answer to that, Your Honors, I believe under Louisiana law that actually Mr. Belli ceased to become a partner when he was filed for bankruptcy in December of 1995. And I don't think his death changed that fact. But the issue here is even if he did not, that his interest terminated in the earlier partnership as of his death, then there's still the issue of there's nothing in Louisiana law that prohibits a partnership, a later partnership or a later form partnership from conferring benefits on a former partner. And I think that's the only way you can construe the inclusion of Mr. Belli's law firm in the 96th Agreement when the drafters were clearly aware that he had died. So I think that's the answer to that point, Your Honor. So that's the only way you can prevail, then? We have to interpret it that way. Well, I think also, Your Honor, if you accept our premise that the bankruptcy – now, I agree, under Louisiana law, the bankrupt estate did not become a member of the partnership in December of 1995 when he filed, but I think Mr. Belli did cease to become a member. And I do think, and we argued this in our reply brief, that by the operation of bankruptcy law, his death cannot impair the estate's rights to pursue that interest. Well, so you have to also have bankruptcy law trump Louisiana law. Yes, that's true. Well, except, Your Honor, on the former partner point. If we're correct about the ability under Louisiana law to confer benefits on a former partner. So we go Louisiana law when it benefits your client and bankruptcy law when it doesn't benefit your client? Well, I don't think that's what we're suggesting, Your Honor. I think what we're saying is that as a matter of law, bankruptcy law does trump, but that even if you determine it didn't, there's nothing in Louisiana law that prohibits or precludes a partnership from conferring benefits on a former partner, which is exactly what happened in October of 1996.  Yes, Your Honor. And I should say quickly, that's my version is that's at least a permissible inference for a finder of fact to draw, and this is summary judgment. Would you elaborate on your view as to the settlement the estate made as to the claim that it had? Did it limit that to $50,000? Yes. What we did is we stipulated that if the – because that's what the bankruptcy judge concluded, that if Mr. Belli's interests were valued in the partnership as of July of 1996, that would be – the value of the estate would in essence be the costs he had advanced. And we agreed – we didn't agree with – we certainly didn't agree with the decision, but we agreed on that aspect of it that that would be the result. But I don't understand why that doesn't give the whole ballpark away, because your theory of recovery has to be that any amount of work that Mr. Belli performed or that his firm performed prior to his date of death had to be his contribution to the ongoing work of the consortium pre- or post-organization, the time expended, the contribution to non-target plaintiffs, et cetera, et cetera. And all of those things ultimately have to be valued as part of the corpus of the estate as of the date of death. But your settlement says we stipulate that the value as of the date of death was $50,000. Now, I think I've hit a blind spot. It just seems to me that that shoots yourself right in the foot. Well, no, Your Honor, that was a – You can't even ask for interest on the $50,000. No. Your Honor, that was all conditioned on – Well, help me out of this dilemma. Well, no. I think that was conditioned on the bankruptcy court's finding that the value of the estate did not include any right to claim part of the Castano ultimate fee. That is all the time and effort which was devoted to the case. He ruled against – The only big condition is that assuming the bankruptcy court is right, then we stipulate that it was $50,000. Well, yes, that's right. But the whole point is I was only making that stipulation assuming the bankruptcy court was wrong about what Mr. Belli's rights were. So it was a conditional stipulation very much dependent on having lost the argument, which is our primary argument, that he has a right under both the 94 agreement and the 96 codification to claim the value of his contribution in time. And you're saying that that agreement does not control if we reverse the bankruptcy court on that point. That's exactly right, Your Honor. That whole stipulation was conditional on it not having any value for that aspect of his interest in the estate, in the partnership. Sotomayor, what significance is it that Belli's practice did not go in – there was a successor to the practice, as I understand it, in that the Leaf Cabraser firm took over the practice? No, they didn't. They took over some of his cases. But no, the law – They didn't take over the practice? No, they did not. In fact, what happened, and this may bear on the interpretational issue, is basically it went to the bankruptcy estate, and the bankruptcy estate has always held the interest in the law offices of Melvin Belli. So there's never been any other owner other than the bankruptcy estate. Now, there was a claim by two people, including Cesar Belli, that he was a partner, but that claim was ultimately – they stipulated that that's not true, that the only owner of the law offices of Melvin Belli is the estate, the bankruptcy estate. So Leaf Cabraser never had any interest in the law offices of Melvin Belli, did take over certain cases. As of the time that Mr. Belli became ill, how many employees did the firm have? He did – he had no partners. I believe he had maybe one associate and one administrative person, and that's – I'm not absolutely certain of that, Your Honor. I think that's about right. It's very small. And at the time that the first confirmation of the partnership under the best scenario – your best scenario took place, how many employees did he have? I think it was quite comparable. I think maybe one associate. I don't think it was materially different in spring of 94 when this original agreement was entered into, we say, and 96. With respect to the members of the Costanza Group, at the time the division of the fee was made, how many members were there at that point? I believe 50-some-odd. I'm not exactly sure. Maybe 62, actually, Your Honor. And has that division of fees been made and distributed, or are there some stay orders that would apply? No. The agreement provided that's going to be paid over, I think, a 20-year period, and the payments that are due as, you know, for however long that's been going have been made and distributed to the partners in accordance with the fee split that was done when the fee was initially set. So if you were determined to be a proper participant in the distribution of those fees at some point, then you could, under your theory, recoup at that point? Yes. I mean, I think our burden at trial, if you would accept our theory, that we would try to prove we were a member, either expressly as identified or as a former partner, and we would prove up what we would have been awarded, more probably than not, had the criteria which we know were employed to split the fee been applied to Mr. Bellock. And our review of the record will demonstrate what, with respect to the time attributions that were made in the process of dividing that fee. I wouldn't expect, Your Honors, to reach that issue in this appeal. I think that's our burden in the court below, if you send it back, to prove what he did and how it compares to other people who got awards. I mean, I think that's our burden to show, more probably than not, what percentage he would have been awarded in light of what other people who had comparable contributions or shorter or longer or whatever. And as I say, we're prepared to do that, but I don't think that's our job up here or your job up here. That's still a live issue. Yes, absolutely. That's our burden to show that. We're only here on the sort of threshold point that we're entitled to make that showing because we were entitled to part of that fee. Thank you. Okay. All right. If you have nothing further, I'll reserve my time for rebuttal. May it please the Court. I'm Tim Tuohy, and I represent the Castano Group. The Abellaia State has now, I think, retreated to the final position that they have, which is that there was some sort of implied agreement from 1994 that was embodied in this 96 agreement, which they believe entitles a former partner to be granted fees for work done in the past. It should be noted that there was no written 1994 agreement. And again, I'd like to get to the big picture. Yes. There were 50 partners or 50 participants, more or less, that ultimately divided the fee. Yes. Ultimately, meaning in the period somewhere around eight years after Mr. Abellaia's death. And in allocating the fees as among those people, were there some parties to the agreement that were not participants in the work for the target plaintiff? There were not. There is an undisputed declaration from Robert Redfern in the record which indicates that only those who did work on the later state actions, participated in committees, or were active participants in the litigation post-1996 received fee awards. There's extensive documentation. Any of the credit for work performed, does any of the credit for the work performed predate work prior to the date of death of Mr. Abellaia? Well, the documentation indicates there was an executive committee that did perform the fee allocations, and they took into account the entire contributions of the members who were existing members at that time. Over what period of time? Primarily and almost exclusively according to the criteria that's set forth in the 96th Agreement for the work done on the state actions and maintaining a presence in the fight against the tobacco companies post-1996. There were many, there were quite a few. Nobody got any credit for work that they performed prior to the date of death? Not unless they had continued to be in the fight and to work afterwards. If they did continue to be in the fight, they did get credit for work performed prior to the date of death. It wasn't done according to some sort of precise mathematical model. What was done was that there was a series of criteria and their decisions were made. These decisions were outlined in a series of specific decisions. Each firm was given a written summary of the percentage that they would get, and each firm was allowed to then argue that they wanted a greater or lesser amount. And there was reference made, I believe, in some of those to earlier work, but the emphasis, and by the way, these were all firms that continued the fight. There were firms that got out of the case after the class action was dismissed and did not continue the fight. So these were all firms that were, no firm got any money that did not continue the Well, if the 1996 agreement incorporates the 1994 oral agreement, do you still win? No, we would say it does not. I don't believe it does incorporate it. But what if it does? Yes, I think we still win because Beloit had no rights under Louisiana law. His rights as partner terminated at the time of his death, and there is nothing in that part of the fight we're going to get anything in a fee award. So there's no, it's not as if the 1994 agreement sort of embodies a fee arrangement for those who stopped working or were dead or withdrew. It is an entirely forward-looking agreement. So from your perspective, even if there is a tribal issue on whether it's an incorporation or whether it's memorialization, the 94 to the 96, you're saying that still Mr. Beloit loses because Louisiana law calculates his interest at the time of his death? Yes. And that's the $50,000 is his interest at the time of the death. That's always included. Well, that was his interest in any capital contributed. Yes. He certainly did not purport, as we are told now, to conditionally cover anything other for his time or effort. Well, our point of view is that he was not entitled to anything for his time or effort prior to that. So your point of view, I mean, well, why does this strike me as somehow as a, I don't want to say shocks my conscience because the judiciary, you know, it's pretty hard to shock the conscience of Federal judges. But under your theory, a partner of a firm could work diligently on behalf of a client, could perform every effort that he could under the code of conduct to protect the interest of a client, and by the mere fortuity of a premature death, could receive nothing if fortuitous. So for some technicality, a different target plaintiff is chosen to bring the case maybe for jurisdictional purposes, maybe for venue purposes, maybe for some other reason, and that merely because this lawyer died, he is cut off and he gets nothing. I believe this is a — Why does that strike me as somehow wrong? Well, I think under that scenario, it might be wrong, but I don't think that's the scenario that existed here. What happened here is that Belli and many other lawyers were involved in what was initially a nationwide class action that was brought in Louisiana court and then was decertified by the Fifth Circuit. A new strategy was picked up, and it's explained in the agreement what that new strategy is, that state-by-state strategy. Mr. Belli did not participate in that. He had died in July of 1996. He wasn't a party to the 1996 agreement. And so it's not as if I were a partner in a law firm and they continued the case without me after my death and my heirs wouldn't get anything from it. This is a situation where one chapter had ended, and it's quite clear from the agreement that the chapter had ended and a new chapter was beginning. And as you — as you — if I understand, it's not just a new chapter because it's not really the same book. A new book. The original litigation failed because the Fifth Circuit decision that you couldn't maintain a class action, so they had to do it piecemeal all over the country. And I urge you to look at the agreement itself because it really throws a dose of reality into this. The mention of Mr. Belli is in a whereas clause that refers back to where we've been in the past. We've been there, you know, we being the group. And there have been efforts made, but those efforts were unsuccessful. We're now starting a new day, and we're going to go forward with a new effort. And it is not — the way that the fees were awarded in this case eventually did not look back to give lifetime achievement awards, as Judge Carlson said in the bankruptcy court, to people who were no longer part of the fight. I mean, that's — I thought your answer to my questions earlier said that there was an allocation of time that predeceased the death as to some partners, that is, those who continued on. Only — I'd have to go back and look at each of the individual allocation sheets. My recollection is that the firms that appealed for fees mentioned their work and the fact that they had been part of the fight from the beginning and the earlier stage. But the focus — Because on a hourly basis, it would be pretty hard to build up, even under lawyers' billing practices, $1.25 billion worth of billable time in one year. Well, the $1.25 billion reflected a nationwide settlement with tobacco that was quite a bit higher than the one individual State action. And so — Was the attorneys' fee award on the basis of hours, or was it on the basis of the settlement amount? It was a settlement. It was a negotiated attorneys' fee award. But the way that the committee that looked at this, the way that they operated, was to focus most certainly on the State class actions and the participation committee. No one got a portion of that award who had not been involved in the class actions, had not either been lead counsel or lower counsel in those class actions, and not served on committees. And that's in Mr. Redfern's declaration. So it's not as if they reached back to people who had been former members, people who had withdrawn, people who had come up with theories relating to the case. None of that entitled you to award unless you were continuing to be present attorney members. And that's what Judge Jenkins pointed to, I think, in his — in the district court opinion, is that the agreement certainly is a forward-looking agreement as to efforts coming in the future. So we would, you know, stand with that agreement, and under the terms of Louisiana law, Mr. Bell, I ignore his sole partnership, had the capacity to even enter into that agreement, and let alone become subject to its terms. Anything further? Thank you. Thank you. Very briefly, Your Honor, the whole point, and I think you're picking up on this, is that this agreement in 1996 was both forward-looking and backward-looking. Clearly, it was made effective as of January 1, 1994. It talks about how important the Castano action was to the future efforts. They absolutely — and these are two things I think are not clear. In getting that $1.25 billion fee, they absolutely featured the addiction theory, which they promoted in 1994. They featured their efforts that were successful, at least in getting the class certified at the district court level. That was very much a part of their presentation. In fact, the whole reason it went to state court was the defendants made an argument that that went beyond the — that they couldn't award fees for efforts other than in connection with Ellis. And the two panel members who voted for it and the court of appeals in New York said, no, you can go back and give these guys credit for their tobacco war expertise, for the early days of Castano. And in fact, I think as he conceded, every member of Castano who was there from the beginning made those arguments in support of their share of the fee. So it's simply not true that either under the terms of the agreement, which expressly provides for it and that the hours are to count, and the way they actually did it, that somebody in Belli's position wouldn't have been able to make a showing. And I would say that the very fact that knowing he was dead, and they still include him as a named attorney member in the October 96 agreement, indicates they intended to reward him if the ship ever came in for what he'd accomplished. And it was significant for all the reasons we set forth in our brief. Okay. Could I just ask you one question? Yes. That has nothing to do with this litigation at all. Who — did the estate own the building in the financial district of San Francisco where he had his offices? I've just always been curious about that. I don't believe so, Your Honor. I don't believe so. Okay. I don't believe so. Okay. Thank you. The matter just argued is submitted for decision. And that concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Lucero, Schroeder, Callahan